UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

TLC REALTY 1 LLC
Doing Business As TLC
GENERAL CONTRACTING, LLC,

        Plaintiff,                           Case No. 3:13-cv-56

vs.

BELFOR USA GROUP, INC.,              Magistrate Judge Michael J. Newman
                                           (Consent Case)

        Defendant.

---

**DECISION AND ENTRY GRANTING IN PART DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DOC. 41)**

---

        This civil consent case -- concerning claims of racial discrimination in contracting under

42 U.S.C. § 1981, and unjust enrichment under Ohio law -- is before the Court on the motion for

summary judgment filed by Defendant Belfor USA Group, Inc. ("Belfor").  Doc. 41.  Both sides

are represented by counsel, and have fully completed discovery.  Plaintiff TLC Realty 1 LLC

doing business as TLC General Contracting, LLC ("TLC") filed a memorandum in opposition.

Doc. 43.  Thereafter, Belfor filed a reply memorandum.  Doc. 50.  The Court has carefully

considered all of the documents before it, and Belfor's motion for summary judgment is now ripe

for decision.

## I.

        A motion for summary judgment should be granted if the evidence submitted to the Court

demonstrates that there is no genuine issue as to any material fact and that the movant is entitled

to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment -- rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted).  Instead, the party opposing summary judgment "must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." *Id.* (citation omitted).  Under Fed. R. Civ. P. 56(c), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the material cited do not establish the absence . . . of a genuine dispute[.]"  Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . .  consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  If the "evidence is such that a reasonable jury could [find] for the nonmoving party[,]" then summary judgment should be denied.  *Anderson*, 477 U.S. at 248.

## II.

In support of its motion for summary judgment, Belfor cites to excerpts of deposition testimony from a number of party representatives and other witnesses, including Teaven Curtiss ("Curtiss"), Chuck Steele ("Steele"), and Tanja Curtiss, and submits affidavits from Steele, Sam

Malone ("Malone"), Brandon Carr, Caitlin Kashef, Rhonda Johnson, and Heather Muzumdar. Doc. 41 at PageID 190, 194-213.   In opposing Belfor's motion, TLC relies on Curtiss's deposition testimony, an affidavit from Demond Hall ("Hall"), evidence submitted by Belfor in support of its arguments, and evidence produced by Belfor in discovery.  Doc. 43 at PageID 491-501.  Except where otherwise noted, the following summary of the evidence sets forth the material undisputed facts, as well as the disputed facts viewed in a light most favorable to TLC.

TLC is a contracting business owned by Curtiss, who is African American.  Doc. 43-1 at PageID 506-07.  Curtiss started the business in 2001.[1]  *Id.*  Belfor is a disaster recovery and property restoration company with locations around the country, including an office in Fairfield, Ohio.  Doc. 41-6 at PageID 362.  The parties' business relationship began in August 2012, when Mike Desparios ("Desparios"), who at that time worked for Belfor as a project manager, approached Curtiss about TLC potentially becoming a Belfor subcontractor.   Doc. 43-1 at PageID 512-13.  Notably, Desparios and Curtiss previously worked together before Desparios joined Belfor.  *Id.*

Desparios and Steele, another Belfor project manager at that time, held an initial meeting with Curtiss on or around August 12, 2012.  *Id.* at PageID 513; doc. 47 at PageID 1105, 1108. Steele and Desparios told Curtiss that he would need to meet with Malone, the general manager of the Fairfield office, to further discuss TLC becoming a Belfor subcontractor.  Doc. 43-1 at PageID 513.   Additionally, they advised Curtiss that certain Belfor paperwork, the "vendor pack," would need to be prepared at that time, including a statement that TLC would only utilize employees paid via withholdings and a W-2 tax form, rather than subcontractors paid via no withholdings and a 1099 form.  *Id.* at PageID 514; doc. 47 at PageID 1114.  According to TLC,

---

[1] TLC went by the name "TLC Realty" until 2010, when Curtiss changed the name to "TLC General Contracting."  Doc. 43-1 at PageID 506-07.

Desparios and Steele knew that TLC only used subcontractors, and advised Curtiss to tell Malone that TLC had W-2 employees and to indicate the same on the paperwork -- *i.e.,* to intentionally misrepresent the status of his workforce. Doc. 43-1 at PageID 514. On August 22, 2012, Curtiss completed the vendor pack, including a Master Subcontract Agreement ("MSA") and Affidavit of Subcontractor, on which he affirmed that he would utilize only W-2 employees on Belfor jobs. *Id.* at PageID 516-17; doc. 41-1 at PageID 216-31. Significantly, the MSA contains a provision requiring subcontractors to obtain advance written authorization from Belfor before performing work outside the scope of any work order, *i.e.,* supplemental work. Doc. 41-1 at PageID 222. TLC was approved by Belfor's corporate office, and Malone met with Curtiss on August 31, 2012 to assign TLC work. *Id.* at PageID 233.

Belfor initially assigned TLC several small jobs. Doc. 43-1 at PageID 524. On or around September 20, 2012, Belfor assigned TLC a large fire restoration job in Lima, Ohio involving a new roof and repairs to the interior of a residence owned by Dennis Wireman ("the Wireman job"). *Id.* at PageID 524-25, 528. Belfor and TLC met and reviewed the scope of work. *Id.* at PageID 524. According to Belfor, Steele subsequently observed TLC performing supplemental work on the Wireman job, and not performing specific work that Steele requested be done. Doc. 41-4 at PageID 328-29. Belfor asserts that it decided not to assign TLC additional jobs due to its experience with TLC on the Wireman job. *Id.* at PageID 329; doc. 41-6 at PageID 363.

William Holt, who is Caucasian, worked for TLC as a subcontractor on the Wireman job. Doc. 43-1 at PageID 528. According to TLC, Holt had a drug problem that impacted his work performance. *Id.* at PageID 529. TLC asserts that it terminated him on that basis, and that Curtiss advised Steele and Malone that Holt was fired because of his drug problem. *Id.* at PageID 530-31. According to Belfor, on or around October 31, 2012, Holt complained to Belfor

that TLC did not pay him for work performed on the Wireman job.[2]  Doc. 41-6 at PageID 363; doc. 41-4 at PageID 329.  Holt also allegedly told Steele that he was a subcontractor, rather than an employee of TLC.  Doc. 41-4 at PageID 329.  Belfor states that Steele confronted Curtiss, who did not deny that Holt was a subcontractor of TLC.  Doc. 47 at PageID 1128.  Belfor asserts that Steele and Malone agreed that TLC would perform no further work for Belfor after the Wireman job because of TLC's noncompliance with Belfor's guidelines.  *Id.* at PageID 1129-30.

Around this same time, in October or November 2012, Belfor established a subcontractor relationship with Holt.  *Id.* at PageID 1124; doc. 41-1 at PageID 237.  According to Belfor, Holt informed Steele that the individuals working on the Wireman job for TLC were actually Holt's employees -- not TLC's.  Doc. 47 at PageID 1126.  Holt completed the vendor pack -- consisting of the same documents Curtiss filled out -- on behalf of Holt Construction[3] and was approved by Belfor corporate.  *Id.* at PageID 1124; doc. 41-4 at PageID 329; doc. 41-6 at PageID 363.   In November 2012, Belfor awarded a new job in Huber Heights, Ohio ("the Huber Heights job") to Holt Construction which, according to TLC, had been promised to Curtiss.  Doc. 41-6 at PageID 363; doc. 43-1 at PageID 523, 538, 547.  TLC asserts that Holt Construction did not have any W-2 employees, and used several of TLC's contractors -- including Hall, an electrician -- on the Huber Heights job.  Doc. 43-1 at PageID 533, 539; doc. 49 at PageID 1148.

Meanwhile, Belfor received invoices from TLC for supplemental work on the Wireman job that had not been pre-approved by Steele in writing, which Belfor did not pay.  Doc. 41-4 at PageID 329-30; doc. 43-1 at PageID 527, 552.  TLC's unpaid invoices total $16,100.  Doc. 43-1

---

[2] Belfor also alleges that more than one of TLC's subcontractors threatened to file a lien against the customer's property because TLC had not paid them for work on Belfor jobs.  Doc. 41-4 at PageID 329.

[3] TLC references "William Holt Contracting" but, for the purposes of this opinion, the Court will use the name "Holt Construction," as this name appears on the Belfor vendor pack paperwork.  *See* doc. 41-1 at PageID 256.

at PageID 527.  TLC claims that Steele orally approved the supplemental work.  *Id.* at PageID 527, 552.  Belfor also alleges that it paid TLC $3,424.67 for work within the original work order that ultimately had to be completed by Belfor.  Doc. 41-4 at PageID 330.

On December 21, 2012, TLC's counsel sent a letter to Belfor alleging that Belfor enforced the W-2 employee requirement against TLC, a minority contractor, and not against Holt Construction.  Doc. 41-3 at PageID 301.  The letter also stated that Holt was a subcontractor on the Wireman job, and that TLC replaced Holt with another subcontractor after Holt was fired. *Id.*  On January 2, 2013, Belfor responded with a letter stating that, due to counsel's representation regarding TLC's use of subcontractors, TLC was no longer an approved vendor and was thus ineligible to work on Belfor projects.  *Id.* at PageID 303 ("the termination letter"). TLC's contract was then formally terminated and TLC was added to Belfor's "Do Not Use" ("DNU") list.  *Id.* at PageID 304; doc. 41-11 at 399.  According to Belfor, the DNU list consists of many businesses -- minority and non-minority owned alike -- who were disqualified from doing business with Belfor when they indicated they would not comply with the W-2 employee requirement.  Doc. 31-3 at PageID 305-27; doc. 41-6 at PageID 363.

Thereafter, following the completion of the Wireman job, Belfor learned of issues with the roof.  Doc. 47 at PageID 1134; doc. 43-1 at PageID 540.  Specifically, Mr. Wireman complained to Belfor that the roof was leaking and, in February 2013, Steele took pictures of the property and determined that the plywood under the roof was warping.  Doc. 47 at PageID 1134; doc. 43-1 at PageID 540; doc. 41-4 at PageID 330; doc. 41-2 at PageID 257-76.  According to Belfor, the problem arose because H-clips were not installed, and the plywood was improperly nailed.  Doc. 41-4 at PageID 330.  TLC contends that H-clips were used on the Wireman job, and denies responsibility for the roof problems.  Doc. 43-1 at PageID 541.  In March 2014, Belfor

entered into a settlement agreement with Mr. Wireman in the amount of $17,416.74, *i.e.,* the cost to replace the roof. Doc. 41-10 at PageID 384-98; doc. 41-9 at PageID 382. Mr. Wireman refused to allow Belfor to perform the rework. Doc. 41-7 at PageID 365; doc. 41-3 at PageID 285.

TLC asserts two claims against Belfor: (1) racial discrimination in contracting in violation of 42 U.S.C. § 1981; and (2) unjust enrichment.[4] Doc. 13. Belfor seeks summary judgment on both claims. Doc. 41.

### III.

Belfor first moves for summary judgment on TLC's § 1981 claim in which TLC alleges that Belfor unlawfully discriminated against it by enforcing the W-2 employee requirement against it, a minority owned business, and not against Holt Construction, a business owned by a Caucasian. Doc. 13 at PageID 108-09. Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). To prevail on such a claim in the absence of direct evidence of discrimination -- which is the case here -- the Court must apply the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which TLC bears the initial "burden of establishing a *prima facie* case of discrimination[.]" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted).

To establish a *prima facie* case, TLC must show that: "(1) [it] is a member of a protected class; (2) [it] was qualified for [the] job; (3) [it] suffered an adverse employment decision; and (4) [it] was . . . treated differently than similarly situated non-protected [subcontractors.]" *Id.* The *prima facie* showing requirement "is not onerous[.]" *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008) (citation omitted). If TLC establishes this *prima facie*

---

[4] TLC's breach of contract claim was previously dismissed by the Court. Docs. 12, 18.

case, the burden shifts to Belfor to offer evidence of a legitimate, non-discriminatory reason for the decision. *White,* 533 F.3d at 391 (citations omitted). Finally, if Belfor articulates such a reason, the burden shifts back to TLC to show that the reason given was not its true reason, but merely a pretext for discrimination. *Id.*

Belfor argues that TLC's claim fails because: (A) it cannot satisfy its *prima facie* case of discrimination; (B) it cannot establish that Belfor's proffered reasons for terminating its contract and adding it to Belfor's DNU list were pretextual; and (C) the "same actor" inference is applicable. Doc. 41 at PageID 203-11. The Court has carefully considered Belfor's arguments and each will be considered in turn.

### A.    *Prima Facie* Case

The parties do not dispute that TLC, through its owner Curtiss, is a member of a protected class and that TLC suffered an adverse employment action when Belfor terminated its relationship with TLC. *See* doc. 41. Instead, in moving for summary judgment, Belfor asserts that TLC fails to meet its burden of demonstrating the second and fourth prongs of its *prima facie* case of race discrimination, namely, that: (1) it was qualified to perform work as Belfor's subcontractor; and (2) Belfor treated a similarly situated subcontractor more favorably. Doc. 41 at PageID 203-06.

### 1.    Qualified Subcontractor

Belfor first contends that TLC was not a qualified subcontractor, arguing that it: performed supplemental work without written approval; communicated poorly with Steele on the Wireman job; improperly installed the roof on the Wireman job; billed for supplemental work that was not pre-approved in writing; and violated Belfor's requirement to use only W-2 employees. Doc. 41 at PageID 203. All of these reasons advanced by Belfor are the same

reasons it proffers as the legitimate, non-discriminatory reasons for terminating its contract with TLC. *Id.* at PageID 207.

Courts "must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge[,]" taking care to not "conflate the distinct stages of the *McDonnell Douglas* test." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (citations omitted). Instead, when determining whether one is qualified for the position, courts "look at a plaintiff's qualifications before the events which precipitated the adverse employment action." *Ford v. Hamilton Cnty. Juvenile Court*, No. 1:05cv557, 2007 WL 2302816, at *6 (S.D. Ohio Aug. 8, 2007) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662-63 (6th Cir. 2000)).

Accordingly, Belfor may not rely upon its articulated nondiscriminatory reasons for terminating TLC in arguing that TLC was not qualified. *Cicero*, 280 F.3d at 585. On the other hand, TLC has presented some evidence that it was a qualified subcontractor, namely that it has been in the contracting business since 2001; Belfor actively recruited TLC to become a subcontractor despite knowledge that it had no W-2 employed workforce; Belfor approved TLC as a subcontractor despite knowing that it did not have any W-2 employees; and Belfor subsequently assigned TLC a large restoration job after TLC completed several smaller jobs. *See supra*. Based upon such evidence, the Court concludes that a genuine issue of material fact exists concerning TLC's qualifications for the contract.

## 2. Similarly Situated

To satisfy the fourth prong of a *prima facie* case of discrimination under § 1981, TLC must show that Belfor treated a similarly situated, non-minority subcontractor more favorably. *White,* 533 F.3d at 391. TLC argues that it was treated less favorably than Caucasian-owned

Holt Construction because Holt Construction was permitted to work for Belfor using independent contractors, while TLC was not.  Doc. 43 at PageID 498.  Belfor argues that Holt Construction is not similarly situated to TLC because TLC has not shown, *inter alia,* that Holt Construction used subcontractors.  Doc. 41 at PageID 204-06.

TLC "need not demonstrate an exact correlation with [Holt Construction] for the two to be considered 'similarly situated[;]'" rather, they must be similar "in all relevant aspects." *Wright v. Murray Guard*, 455 F.3d 702, 710 (6th Cir. 2006) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  In the disciplinary context, the Sixth Circuit has held that "to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'"  *Id.*  Factors relevant to this assessment include whether TLC and Holt Construction were "subject to the same standards[,]" and whether they "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [Belfor's] treatment of them for it."  *Id.*

The evidence, viewed in a light most favorable to TLC, demonstrates that, in 2012, TLC and Holt Construction both completed the same vendor pack, affirmed that they would only use W-2 employees on Belfor jobs, and became Belfor subcontractors in the Cincinnati-Dayton, Ohio region.  Doc. 43-1 at PageID 516-17; doc. 41-1 at PageID 216-31, 233, 256; doc. 47 at PageID 1124; doc. 41-4 at PageID 329.  Contrary to Belfor's contention, TLC has presented evidence -- in the form of Curtiss's deposition testimony and Hall's affidavit -- that Holt Construction also used subcontractors on a Belfor job, yet was not terminated or added to Belfor's DNU list.  Doc. 43-1 at PageID 533, 539; doc. 49 at PageID 1148.  Thus, both utilized subcontractors on Belfor jobs and only TLC was terminated.  Doc. 41-3 at PageID 303.  The evidence before the Court also shows that Belfor knew or should have known that Holt

Construction was in violation of the W-2 employee requirement -- because of the December 21, 2012 letter by TLC's counsel, in which counsel advised Belfor of Holt Construction's apparent use of contract employees.  *Id.* at PageID 301.  Viewing the evidence in the light most favorable to TLC, the Court finds TLC and Holt Construction similar with regard to all of the foregoing, and that they were treated differently by Belfor.  *See Jackson,* 518 F.3d at 396 (finding that the "purpose of . . . Section 1981 [is] not served by an overly narrow application of the similarly situated standard").

Belfor contends, however, that TLC and Holt Construction are not similarly situated because Holt Construction never performed in an unworkmanlike manner, unlike TLC on the Wireman job.  Doc. 41 at PageID 205-06.  The Court finds an issue of fact exists on the materiality of TLC's work performance because the sole reason given in TLC's termination letter was TLC's noncompliance with the W-2 employee requirement -- not performance issues.  Doc. 41-3 at PageID 303.  Further, issues of fact remain as to whether Belfor knew about the problems on the Wireman job, and who was responsible for such problems, at the time Belfor terminated TLC.  *See* doc. 41-4 at PageID 330 (demonstrating that Belfor may not have known the reasons the roof was leaking until February 2013, *i.e.,* a month after it terminated TLC).

Accordingly, based on all of the foregoing, issues of fact remain as to whether Belfor treated similarly situated subcontractors more favorably.

### B.    Legitimate Non-Discriminatory Reason and Pretext

Because TLC has established a *prima facie* case, the burden shifts to Belfor to offer evidence of a legitimate, non-discriminatory reason for its decision to terminate TLC's contract and place it on the DNU list.  *White,* 533 F.3d at 391 (citations omitted).  Without dispute, Belfor has satisfied its burden in this regard by presenting evidence that its decision was motivated by:

(1) TLC's performance issues on the Wireman job; and (2) TLC's use of subcontractors in contravention of the MSA and Affidavit of Subcontractor. Doc. 41 at PageID 207; doc. 41-1 at PageID 238; doc. 47 at PageID 1129-30; doc. 41-4 at PageID 329; doc. 41-6 at PageID 363. Accordingly, the burden shifts back to TLC to show that Belfor's proffered reasons were a mere pretext for unlawful discrimination. *White,* 533 F.3d at 391.

TLC can show pretext by demonstrating that Belfor's proffered reasons: (1) had no basis in fact, (2) did not actually motivate Belfor's actions, or (3) were insufficient to motivate Belfor's actions. *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 (6th Cir. 2009) (citations omitted). TLC retains the ultimate burden of producing "sufficient evidence from which a jury could reasonably reject [Belfor's] explanation" of why it terminated TLC. *Id.* However, to survive summary judgment, TLC does not need to conclusively disprove Belfor's proffered reasons. *Brewer v. New Era, Inc.,* 564 F. App'x 834, 842 (6th Cir. 2014).

### 1. Pretext Regarding Job Performance

With regard Belfor's first proffered reason, *i.e.,* TLC's performance on the Wireman job, TLC has presented evidence upon which a reasonable jury could rely to conclude that such reason had no basis in fact or did not actually motivate Belfor's actions. TLC first points to the lack of written communication between Belfor and TLC regarding such performance issues prior to TLC's termination. Doc. 43 at PageID 499. Second, many of the significant issues with the Wireman job -- *i.e.,* the leaking roof and eventual $17,416.74 settlement -- were unknown to Belfor at the time of termination and thus could not have motivated Belfor's decision. *See* doc. 41-4 at PageID 330; doc. 41-10 at PageID 384-86. Finally, and, significantly, the sole reason given in the termination letter was TLC's noncompliance with the W-2 employee requirement,

*see* doc. 41-3 at PageID 303, which reasonably suggests that TLC's job performance was not a reason for its termination.

### 2.    Pretext Regarding Non-W-2 Employees

With regard to TLC's noncompliance with the W-2 employee requirement, TLC has sufficiently demonstrated that, although it admittedly used only independent contractors paid via 1099, such reason did not actually motivate Belfor's decision to terminate TLC.  *See Johnson*, 319 F.3d at 866.  TLC presented evidence that Belfor agents Desparios and Steele knew that TLC only utilized subcontractors, yet directed Curtiss to misrepresent such a fact in the vendor pack.  Doc. 43 at PageID 514.  This fact, although disputed by the parties, when viewed in a light most favorable to TLC, supports an inference that TLC's termination was not actually motivated by its use of non-W-2 employees.  Further, Belfor even admits that it knew about TLC's noncompliance with the MSA in October 2012, yet did not terminate TLC at that time.  Doc. 41 at PageID 198; doc. 41-4 at PageID 329.  Finally, as discussed *supra,* TLC has presented evidence that Holt, a similarly situated subcontractor, also violated the W-2 employee requirement, but was not terminated -- suggesting that such reason was insufficient to motivate Belfor's actions.  *Johnson,* 319 F.3d at 866 (citations omitted).[9]

### 3.    Evidence of Racial Animus

Additionally, there is evidence that arguably demonstrates racial animus; namely, an email from Desparios to Steele and Malone -- referencing Curtiss -- with a subject line "FYI OUR MEETING WITH A RAPIST[.]"[10]  Doc. 43-3 at PageID 567.  The email states:

---

[9] Belfor argues that TLC cannot show that its decision to terminate TLC was pretextual because its DNU list contains non-minority owned subcontractors who indicated that they would not comply with the W-2 employee requirement.  Doc. 41 at PageID 210.  While this evidence supports Belfor's nondiscriminatory reason, it does not foreclose TLC's showing of pretext.  *Brewer*, 564 F. App'x at 842 (a plaintiff need not "disprove[] the defendant's proffered rationale" to survive summary judgment).

[10] It is undisputed that Curtiss was acquitted on a 2014 rape charge.  Doc. 43-1 at PageID 561.

> We should have run a background check on this guy a long time ago . . . so well this is who we are inviting to our office today. . . not sure I'm too comfortable with this.  Hopefully he doesn't pack a gun.  Look at the rest of his []rap sheet. Who knows what he's capable of . . .

*Id.*  Though it does not mention race directly, a reasonable jury could certainly conclude that there are racial undertones to this email.

Based on the foregoing, the undersigned concludes that TLC has produced sufficient evidence upon which a reasonable jury could rely to reject both of Belfor's proffered reasons for terminating TLC.  *See Chen,* 580 F.3d at 400.

### C.      Same-Actor Inference

Finally, Belfor argues that TLC's § 1981 claim fails because Malone both hired and made the decision to terminate TLC, thus giving rise to the "same actor" inference.  Doc. 41 at PageID 211.  This inference "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee."  *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 572 (6th Cir. 2003).  However, "if the [plaintiff] has otherwise raised a genuine issue of material fact[,]" the same-actor inference "is insufficient to warrant summary judgment[.]" *Gaglioti v. Levin Group, Inc.*, 508 F. App'x 476, 483 (6th Cir. 2012).  Because there are disputes of material fact regarding Belfor's proffered reasons for terminating TLC, *see supra*, Belfor's argument in this regard fails.  *Gaglioti*, 508 F. App'x at 483.

For the foregoing reasons, the Court **DENIES** Belfor's motion for summary judgment on TLC's § 1981 claim.

### IV.

Belfor next seeks summary judgment on TLC's state law unjust enrichment claim.  Doc. 41 at PageID 211-13.  "Unjust enrichment is an equitable doctrine, not based on contract law but upon quasi-contract."  *Homan, Inc. v. A1 AG Servs., L.L.C*., 885 N.E.2d 253, 260 (Ohio Ct. App.

2008). Unjust enrichment arises when a person "has and retains money or benefits which in justice and equity belong to another." *Johnson v. Microsoft Corp.,* 834 N.E.2d 791, 799 (Ohio 2005) (citations omitted). To prevail on an unjust enrichment claim under Ohio law, one must demonstrate that: "(1) a benefit [was] conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984).

However, "absent fraud, illegality, or bad faith, a party to an express agreement may not bring a claim for unjust enrichment, particularly when the express agreement contains a provision governing the allegedly inequitable conduct of the other party." *Urban Assocs., Inc.*, *v. Standex Elecs., Inc.*, 216 F. App'x 495, 512 (6th Cir. 2007) (citing *Sammarco v. Anthem Ins. Cos., Inc.*, 723 N.E.2d 128, 137 (Ohio Ct. App. 1998)). "Any fraud or bad faith that negates the operation of this rule must occur in the formation of the contract." *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996) (citing *Eyerman v. Mary Kay Cosmetics*, 967 F.2d 213, 222 (6th Cir. 1992)).

TLC argues that Belfor was unjustly enriched when it received $16,100 of labor and materials from TLC on the Wireman job, and failed to pay TLC for same. Doc. 13 at PageID 109-10. Belfor contends, *inter alia*, that TLC's claim is barred because TLC's unpaid invoices are for supplemental work, and the MSA -- a contract binding on both parties -- specifically addresses payment for such work. Doc. 41 at PageID 212-13. The Court finds merit to Belfor's argument.

The MSA provides that:

SEVENTH: No extra or additional work or change orders will be paid for by BELFOR unless agreed to in writing by an authorized representative of BELFOR

> in advance of the performance of the work. Additional work performed by a Subcontractor without advance written authorization under this Master Agreement will not be paid for unless agreed to in writing by an authorized representative of BELFOR.

Doc. 41-1 at PageID 222. In his deposition, Curtiss admits that the unpaid invoices are for supplemental work done on the Wireman job, but testified that Steele orally approved the work. Doc. 43-1 at PageID 527, 552. Further, in opposing Belfor's motion for summary judgment, TLC does not argue that it ever received written approval for such work, and points to no evidence of any written approval. *See* doc. 43 at PageID 501.

Accordingly, because an express agreement exists between the parties authorizing Belfor to withhold payment for supplemental work that was not pre-approved in writing -- and because TLC presents no evidence of fraud, illegality, or bad faith in the formation of the contract -- its unjust enrichment claim has no merit under Ohio law. *Urban Associates, Inc.*, 216 F. App'x at 512; *R.J. Wildner Contracting Co., Inc.*, 913 F. Supp. at 1043. As a result, Belfor's motion for summary judgment on TLC's unjust enrichment claim is **GRANTED**.

## V.

For the foregoing reasons, Belfor's motion for summary judgment (doc. 41) is **GRANTED** with regard to TLC's unjust enrichment claim, and **DENIED** as to the § 1981 claim.

The Court confirms the final pretrial conference scheduled for **January 13, 2016** at **3:00 p.m.** in chambers (Room 505, 200 West Second Street, Dayton, Ohio 45402). Counsel and a representative from both parties shall attend.

**IT IS SO ORDERED**.

Date:  January 8, 2016                     *s/ Michael J. Newman*
                                           Michael J. Newman
                                           United States Magistrate Judge

16